# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

VICTOR VELAZQUEZ,          )
                                         )

               Plaintiff,     )
                                         )

v.                                )     Case No. 15-CV-0017-CVE-TLW
                                         )

HELMERICH & PAYNE INTERNATIONAL   )
DRILLING CO.,              )
                                         )

             Defendant.   )

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Leave to Join Parties and Amend Answer to Assert Counterclaims (Dkt. # 26) and Defendant Helmerich & Payne International Drilling Co.'s Motion for Summary Judgment against Plaintiff, Jesus Martinez, [sic] and Brief in Support (Dkt. # 37).[1]  Defendant Helmerich & Payne International Drilling Co. (H & P) asks the Court to enter summary judgment in its favor on all of plaintiff's claims.  H & P also requests leave to file an amended answer alleging counterclaims of slander, malicious interference with business relations, malicious interference with prospective economic advantage, and civil conspiracy against plaintiff and plaintiff's counsel.

## I.

On January 6, 2010, H & P hired Victor Velazquez to work as a welder in its piping division at its West Tulsa Facility, and he was originally hired as a welder II.  Dkt. # 37-1.  Velazquez was paid an hourly wage of $17.50 when he was hired.  Dkt. # 37-8.  Venkat Talladivedula, a native of

---

[1]    Defendant filed an errata (Dkt. # 38) to correct the title of its motion for summary judgment, because the title incorrectly identifies the plaintiff as Jesus Martinez.  The Court deems the title of the motion corrected to identify the correct plaintiff, Victor Velazquez.

India, was the plant manager who hired Velazquez and he was aware that Velazquez was Hispanic at the time Velazquez was hired.  Dkt. # 37-3, at 1; Dkt. # 37-4.  On April 26, 2010, Velazquez was promoted to the position of welder I, and his hourly wage increased to $19 per hour.  Dkt. # 37-8, at 1.

H & P has an employee handbook that contains equal employment and anti-discrimination policies, and Velazquez signed a form acknowledging that he received a copy of the employee handbook.  Dkt. # 37-7.  In addition to providing the handbook to Velazquez, H & P required that he attend training about the handbook and H & P's harassment and anti-discrimination policies. Dkt. # 37-5, at 25.  The handbook provides that an employee "[i]mmediately advise the manager or supervisor on duty of the offending or harassing conduct or discrimination," and an employee may escalate the matter to the director of human resources if the offending party is a manager or if the manager fails to act on the employee's complaint.  Id. at 110.  The handbook provides the e-mail addresses for H & P's director of human resources and general counsel.  Id.  H & P also maintains a confidential and anonymous "Ethics Hotline" that allows employees to report unethical conduct, including discrimination.  Id. at 119.

In August 2010, Velazquez and a co-worker made a complaint to the fabrication manager, Jim Austin, that another employee had called them each a "wetback."  Dkt. # 37-9, at 1; Dkt. # 53-1, at 25.  H & P investigated the matter and confirmed Velazquez's report that the employee, Kenneth McClain, used discriminatory language.  Dkt. # 37-5, at 103.  McClain was formally disciplined and he was denied a promotion based on his discriminatory conduct.  Dkt. # 37-10, at 1.  Velazquez testified in his deposition that he was not retaliated against by H & P for making a complaint about McClain's conduct.  Dkt. # 37-5, at 22. On April 11, 2011, Velazquez was promoted to the position

2

of fitter-welder and his pay was increased to $20 per hour.  Id. at 123.  The position of fitter-welder was the second-highest position in fabrication department, and only the position of lead fabricator ranked about the position of fitter-welder.  Dkt. # 37-3.  On May 26, 2011, Austin received a complaint from Levi Peaslee, a white male, that Velazquez had said that "I can't even go to the bathroom here, these lazy fucking white boys stand around and talk all the time." Dkt. # 37-5, at 125.  Peaslee felt that the comment was directed at him and he asked Austin to fire Velazquez for using discriminatory language.  Id.  H & P disciplined Velazquez for using discriminatory language and Austin held a training class concerning H & P's anti-discrimination and harassment policies on May 27, 2011.  Id. at 50, 59-60.  In July 2012, H & P raised Velazquez's pay to $21.25 per hour. Dkt. # 37-16.

On March 26, 2012, Talladivedula promoted Terry Wells to the position of lead fabricator.[2] Dkt. # 37-3.  A lead fabricator is responsible for:

> direct[ing] labor, equipment and material specific to the fabrication of the project. The Lead Fabricator will coordinate with materials handlers to expedite material needed to build the project.  The Lead Fabricator will direct labor and equipment used to fabricate jigs and fixtures used in the fabrication of a project and will follow direction from the Fabrication Manager to carry out any miscellaneous task.  The Lead Fabricator may be qualified to one or more welding procedure specifications and directed to make production welds.

Dkt. # 37-15.  A lead fabricator is not considered a supervisor, and a lead fabricator does not have the authority to fire an employee or to recommend that an employee be fired.  Dkt. # 37-11, at 5. Talladivedula states that Wells had significantly more welding experience than Velazquez, and much of Wells' experience also involved working with piping.  Dkt. # 37-3.  Velazquez does not dispute

---

[2]     The parties use the phrase "lead man" in their briefs and in deposition testimony, but the position was officially called "lead fabricator" by H & P.  The Court will use the term "lead fabricator" in this Opinion and Order.

that Wells had more experience.  Dkt. # 53, at 11.  At some point before Wells was promoted, Velazquez claims that Wells referred to him as a "fucking Mexican," and Velezquez claims that he reported the incident to Talladivedula and his lead fabricator.  Dkt. # 53-1, at 45.  Velazquez testified in his deposition that Wells did not make any other similar comments and he felt that the matter was resolved.  Id. at 46.  In October 2011, there was an opening for a lead fabricator in the motor control cabin division and Terry Spencer was promoted to that position, but Velazquez does not dispute that the position required minimal piping work and it was not a good fit with his experience.  Dkt. # 37-3, at 2; Dkt. # 53, at 11.  These were the only two openings for a lead fabricator position during Velazquez's employment, and he believes that he should have been promoted ahead of Wells.[3]  Dkt. # 53, at 12.

In February 2013, Austin left his job as the fabrication manager for H & P and Dwayne Garland was hired to replace Austin.  Dkt. # 37-3, at 2.  Velazquez was verbally disciplined multiple times during 2013 for tardiness or attendance related issues.  Dkt. # 37-5, at 70-74.  In May 2013, Wells noticed that Velazquez was standing around and talking during his shift, and he saw that Velazquez would come back from breaks between 10 and 30 minutes late.  Dkt. # 37-13, at 1.  Wells also observed Velazquez talking on his cell phone on multiple occasions during his shift, and Wells

---

[3]     Plaintiff believes that Wells was less qualified for the position of a lead fabricator, because Wells harbored "obvious racial animus" against Hispanics.  Dkt. # 53, at 11.  However, he does not dispute that Wells had more experience.

confronted Velazquez while he was talking on the phone.[4]  Id. at 2.  Velazquez responded that Wells

was "coming at him like a big man trying to be the boss."  Id. at 2.

On September 23, 2013, Tim Owens was promoted to the position of fabrication manager

for the West Tulsa Facility.  Dkt. # 37-3, at 3.  Velazquez received another pay raise in October 2013

and his pay was increased to $22 per hour.  Dkt. # 37-17.  On January 14, 2014, Owens noticed that

Velazquez was outside of his work area and he was disturbing other employees, and Owens told

Velazquez to go back to work.  Dkt. # 37-11, at 6, 12.  Velazquez left work early on January 17,

2014, and it is undisputed that he did not have permission to leave early.  Dkt. # 53-1, at 50-51.

Velazquez testified in his deposition that employees had the option to leave early on Fridays and that

his request was denied.[5]  Id. at 51.

When Velazquez arrived at work on January 18, 2014, Owens met with Velazquez and Wells

in Owens' office to discuss Velazquez's decision to leave work early the previous day, but the

parties dispute what actually took place at the meeting.  According to Owens, he asked Wells to

bring Velazquez to his office to find out why Velazquez clocked out early on January 17, 2014, and

Velazquez came to the office with Wells.  Dkt. # 37-11, at 9.  However, Velazquez refused to

---

[4]     Plaintiff argues that his daughter was suffering from leukemia and he was taking a call about his daughter.  Dkt. # 53, at 12.  However, the content of the call is irrelevant, because plaintiff has presented no evidence that Wells knew who plaintiff was talking to or that he had any animus against plaintiff for taking care of a sick child.  The evidence has been offered by defendant to show that Wells observed plaintiff talking on his phone on multiple occasions and that plaintiff responded with hostility when he was confronted about using his phone during work hours.

[5]     In his response, plaintiff states that he had to leave work early due to a family emergency and he felt that it was necessary to leave even without permission.  Dkt. # 53.  However, his deposition testimony does not reference a family emergency and the evidence in the summary judgment record provides no explanation as to why he left work early on January 17, 2014.

discuss the matter and he walked out of the office.  Id.  Wells and Owens followed Velazquez, and

Owens directed Velazquez to clock out and go home.  Id.  However, Velazquez did not leave and

Wells claims that Velazquez told him to "watch his back" in a threatening manner.  Dkt. # 37-13,

at 2.  Another employee, Melchor Manahan, overheard Velazquez's threats and told him to relax.

Dkt. # 37-18.  Velazquez left after making the threatening remarks, but Wells informed Owens about

his encounter with Velazquez.  Dkt. # 37-13, at 2.  Owens spoke to Wells and Mahanan before

making any decision about Velazquez's continued employment at H & P.  Dkt. # 37-11, at 10.

Owens found that Wells' and Manahan's representations about Velazquez's conduct were credible.

Dkt. # 37-19, at 2.  Velazquez's deposition testimony offers a very different version of the events

leading up to his termination.  Velazquez claims that he was called into Owens' office and that

Owens yelled at him for no reason.  Dkt. # 53-1, at 50.  Velazquez states that he asked Owens to stop

yelling, and Owens allegedly told Velazquez that "you don't understand because you are Mexican."

Id.  Velazquez states Wells scolded him for talking back to Owens.  Id.  Velazquez admits that he

left Owens' office but he claims that he did not need to cool off and he was not upset.  Id. at 51.

Velazquez claims that there was a prior incident in which Owens called Velazquez into his office

and yelled at Velazquez.  Id. at 46.  Velazquez states that he asked Owens not to yell at him, and

Owens said that no one would believe him if complained about Owens' conduct because Velazquez

was Mexican.  Id. at 47.

Owens decided that Velazquez's employment should be terminated, and he met with

Velazquez on January 20, 2014 in John Ballenger's office.  Dkt. # 37-19, at 2.  Ballenger is a health,

safety, and environment field representative for H & P, and he was present at the meeting.  Dkt. #

37-20.  Owens informed Velazquez that his employment was being terminated because he had

threatened another employee, and Velazquez was escorted off the premises.  Dkt. # 37-5, at 68-69.

Velazquez admits that neither Owens nor Ballenger made any statements referencing Velazquez's

ethnicity or nationality during the meeting.  Id. at 69.  Owens states that he terminated a Caucasian

employee in March 2015 when that employee, Mitchell Dennis, threatened a co-worker.  Dkt. # 37-

19, at 2.

Velazquez claims that several incidents occurred during his employment in which he was

treated in a discriminatory manner because of his race or national origin.  Velazquez claims that

Wells directed a co-worker, Felipe Coronado, to put duct tape over Velazquez's mouth because

Velazquez was talking too much.  Coronado testified in his deposition that he suggested that he put

duct tape on Velazquez's mouth, and Wells did not attempt to stop Coronado.  Dkt. # 53-2, at 28.

Velazquez's deposition testimony on this issue is that Wells specifically directed Coronado to put

the tape over Velazquez's mouth, although he admits that he did not actually hear Wells give an

order.  Dkt. # 53-1, at 55-56.  Coronado testified that he intended it as a joke to show that Velazquez

was talking too much, and he did not act with an intent to discriminate against Velazquez.  Dkt. #

37-21, at 2; Dkt. # 53-2, at 28.  Velazquez took the tape off to ask Coronado to take pictures with

the tape on, and Velazquez stated that he would use the pictures against H & P if anything happened

to his employment.  Dkt. # 37-21, at 3-4.  Velazquez did not make any type of complaint to H & P

about the incident, but Velazquez testified in his deposition that he did not think the incident was

a joke and he believes that Wells motivated Coronado's action in putting tape over Velazquez's

mouth.  Dkt. # 53-1, at 56-57.  Coronado testified that Wells and Velazquez did not like each other

and that Velazquez took offense at Wells for the incident, but Coronado's deposition testimony does

not suggest that he believed that Wells was attempting to discriminate against Velazquez due to his race or national origin.  Dkt. # 53-2, at 29.

Velazquez claims that Wells threw a piece of scrap metal at him and the metal hit Velazquez in the ankle.  Dkt. # 37-5, at 51.  Wells told Velazquez to clean up his work area, and Velazquez responded that it was not necessary for Wells to throw the metal at him.  Id.  Wells was not the lead fabricator when the incident occurred and Velazquez has not alleged that Wells made any discriminatory statements.  Id. at 51, 54-55.  Velazquez states that he did inform his lead fabricator, Justin Leroy, about the incident, but he did not make a formal complaint and no action was taken against Wells as a result of the incident.  Dkt. # 37-1, at 39.

Velazquez claims that Wells attempted to incite a fight between Velazquez and co-worker, Isaac Bateman, after Velazquez alleged that Bateman was attempting to intimidate him.  Velazquez claims that Bateman repeatedly threatened to harm him and he reported the harassment to Wells, and Wells asked Bateman to come over to Velazquez's work area.  Id. at 29-32.  Wells allegedly said that it "is fun to see two people fight," and Velazquez believes that Wells was attempting to encourage Velazquez and Bateman to have a physical altercation.  Id. at 32.  Wells did not refer to Velazquez's national origin or ethnicity during the incident.  Id. at 33.  Velazquez reported the incident to Talladivedula and Talladivedula said that he would talk to Wells and Bateman, and Velazquez was not harassed by Bateman again.  Dkt. # 37-5, at 46.

Velazquez filed this case in Tulsa County District Court alleging claims of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII) (counts one and three),  42 U.S.C. § 1981 (counts two and three), and the Oklahoma Anti-Discrimination Act,

OKLA. STAT. tit. 25, § 1101 et seq. (OADA) (count six).[6]  He also alleges claims of intentional infliction of emotional distress (count four) and negligent hiring and supervision (count five).  H & P removed the case to this Court based on federal question jurisdiction.  The Court dismissed plaintiff's retaliation claims to the extent he was seeking relief under Title VII and the OADA, because plaintiff failed to exhaust his administrative remedies for this claims. Dkt. # 16, at 6-8.  The Court also dismissed plaintiff's intentional infliction of emotional distress claim, but plaintiff has filed an amended complaint (Dkt. # 17) realleging this claim.  H & P has filed a motion for summary judgment as to each of plaintiff's claims.[7] H & P also seeks to join parties and assert counterclaims for slander, malicious interference with business relations, malicious interference with prospective economic advantage, and civil conspiracy.

## II.

Defendant seeks leave to file counterclaims against plaintiff and plaintiff's counsel for slander, malicious interference with business relations, malicious interference with prospective economic advantage, and civil conspiracy, because defendant claims that it has discovered evidence

---

[6]     Plaintiff seeks relief under Title VII and § 1981 under various theories of discrimination.  As to count one, the parties agree that plaintiff seeks relief under Title VII under theories of wrongful termination, failure to promote, and hostile work environment.  Count two is a § 1981 claim and plaintiff simply re-incorporates the allegations of count one.  Count three seeks relief for retaliation under Title VII and § 1981.  As to plaintiff's OADA claim (count six), the parties do not make separate arguments as to that claim and the Court's rulings as to plaintiff's Title VII and § 1981 are also applicable to plaintiff's OADA claim.  See Broyles v. Howard-DCIII, LLC, 2014 WL 347043 (N.D. Okla. Jan. 30, 2014) (the same legal analysis applies to OADA and Title VII claims and an OADA claim fails if a Title VII claim based on the same facts also fails).

[7]     The motion for summary judgment also requests a ruling that plaintiff is not entitled to back pay or front pay if any of his Title VII claims survive summary judgment. Dkt. # 37, at 48.  The Court finds that this issue is more appropriate for a pretrial motion in limine, and the remedy issue will not be discussed in this Opinion and Order.

suggesting that plaintiff fabricated the duct tape incident and that plaintiff's counsel appeared on television to make false statements about defendant's conduct. Dkt. # 26.

Defendant requests leave to join parties and allege counterclaims based on information it has learned in the discovery process. Under Fed. R. Civ. P. 15(a)(2), after the opposing party has served a responsive pleading, "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Minter v. Prime Equipment Co., 451 F.3d 1196, 1204 (10th Cir. 2006). The decision to grant leave to amend is within the discretion of the district court but, when leave is sought, it should be "freely given when justice so requires." Bradley v. Val-Majias, 379 F.3d 892, 900-91 (10th Cir. 2004). Leave to amend may be denied if the proposed amendment would be futile and would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc., 175 F.3d 848, 859 (10th Cir. 1999). Denial of a motion to amend may also be appropriate if the moving party unduly delayed when seeking leave to amend and has no adequate explanation for the delay. Minter, 451 F.3d at 1206. "In the Tenth Circuit, untimeliness alone is an adequate reason to refuse leave to amend." Duncan v. Manager, Dept' of Safety, City and County of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005).

When a party seeks leave to amend after expiration of a scheduling order deadline, the moving party must also show good cause pursuant to Fed. R. Civ. P. 16. for seeking leave to amend outside of the deadline established in the Court's scheduling order, in addition to the Rule 15(a) standard for allowing a party to amend a pleading. Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1240 (10th Cir. 2014). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" Id. at 1240 (quoting Pumpco, Inc. v. Schenker Int'l, Inc., 204 F.R.D. 667, 668 (D. Colo. 2001)). The good

cause requirement may be satisfied "if a plaintiff learns new information through discovery or if the underlying law has changed." Id. at 1240.

The deadline in the scheduling order to file motions to join parties or amend pleadings was May 11, 2015 and defendant filed its motion (Dkt. # 26) on July 16, 2015. This means that defendant must show good cause under Rule 16 and establish that leave should be granted under Rule 15 to allow defendant to file counterclaims against plaintiff. Defendant states that it took plaintiff's deposition on June 9, 2015, and plaintiff testified that Coronado was the H & P employee who allegedly put duct tape over plaintiff's mouth. Dkt. # 26, at 2. Defendant took Coronado's deposition on July 2, 2015, and Coronado's testimony was inconsistent with plaintiff's testimony on several important points. Id. Defendant's motion to amend was filed two weeks after Coronado's deposition. Plaintiff argues that defendant's motion is untimely, because defendant has alleged since the case was filed that plaintiff's duct tape story is false. Dkt. # 34, at 3. Plaintiff also claims that defense counsel badgered him during his deposition about the truthfulness of his account about Well's involvement in the duct tape incident. Id. at 4-5. However, the Court finds that defendant acted reasonably by refraining from filing a motion to amend until it discovered some evidence supporting its theory that plaintiff's version of the duct tape incident is a fabrication. The parties dispute what actually occurred during the duct tape incident and, contrary to plaintiff's assertion, Coronado's testimony does support defendant's argument that plaintiff fabricated or at least exaggerated what occurred. Defendant filed its motion to join parties and add counterclaims shortly after learning of new evidence in discovery, and the Court finds that defendant has established good cause for filing its motion after the deadline in the scheduling order expired.

While defendant has established good cause to file an otherwise untimely motion, the Court must also consider whether leave should be granted under Rule 15 to join parties and assert counterclaims. Plaintiff argues that the proposed counterclaims are simply a scare tactic and that the counterclaims would be meritless. Defendant claims that plaintiff's counsel conducted an inadequate investigation before filing the case and appeared on a local news channel to defame defendant with plaintiff's account of the duct tape incident, and defendant seeks leave to proceed with counterclaims concerning the harm done to its reputation by the acts of plaintiff and his attorney. The Court finds that allowing defendant to join parties and assert counterclaims would result in a waste of the parties' and the Court's resources, because defendant is seeking to elevate a factual dispute with plaintiff's version of events into a satellite litigation that will delay a ruling on plaintiff's claims. The parties are free to dispute what occurred during the duct tape incident, and if the case proceeds to trial they may present their differing versions to the jury. However, this dispute is a fairly ordinary disagreement between opposing parties in an employment discrimination case. It is clear from the briefing that there is an unusual level of hostility between the parties and their attorneys, and this appears to be motivating defendant's proposed counterclaims. This is not a reason to allow the parties to delay the proceedings with unnecessary and distracting counterclaims, and defendant's motion to join parties and add counterclaims should be denied.[8]

---

[8]     The Court makes no finding on the merits of the proposed counterclaims, and nothing in this Opinion and Order would prevent defendant from seeking to file its claims in a separate case. Defendant's motion is denied due to the unnecessary distraction and delay that would be caused in these proceedings by granting defendant's motion. As the case proceeds, counsel for both parties are advised to focus on the facts and law, not their disagreements with opposing counsel.

12

**III.**

**A.**

Defendant seeks summary judgment on plaintiff's Title VII and § 1981 claims of race and national origin discrimination based on plaintiff's termination.[9]  Plaintiff responds that there are genuine disputes of material fact as to the decision maker's discriminatory intent, and he asks the Court to deny defendant's motion for summary judgment on this claim.

Plaintiff alleges that his employment was terminated because of his race and national origin, and he seeks relief under Title VII and § 1981.  Plaintiff does not have direct evidence of discrimination and the Court must apply the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting analysis when reviewing plaintiff's claims.[10]  Plaintiff must first establish a prima facie case of national origin discrimination.  Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008).  This requires plaintiff to produce evidence raising a genuine issue of material fact that "(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  See EEOC v. PVNF, Inc., 487 F.3d 790, 800 (10th Cir. 2007).  If plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to come forward with a legitimate non-discriminatory reason for any adverse employment action.  Adamson

---

[9]     The Court notes that § 1981 prohibits racial discrimination only, but Courts have generally permitted a Hispanic plaintiff to proceed under § 1981 on the theory that discrimination against a person due to his ancestry falls within the scope of § 1981.  Velazquez v. Tyson Fresh Meats, Inc., 2007 WL 2994068, *5 n.7 (D. Kan. Oct. 12, 2007).

[10]    The Court applies the same legal standards to evaluate Title VII and § 1981 discrimination claims, and this include the McDonnell-Douglas burden shifting analysis.  Crowe v. ADT Sec. Servs., Inc., 649 F.3d 1189, 1194 (10th Cir. 2011).

13

v. Multi Community Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  If the defendant

provides a legitimate, non-discriminatory reason for its actions, the burden shift to the plaintiff to

show that the defendant's explanation is pretextual.  Young v. Dillon Cos., Inc., 468 F.3d 1243,

1249 (10th Cir. 2006).

 Defendant argues that plaintiff cannot establish a prima facie case of discrimination as to his

termination, because plaintiff has not identified any discriminatory conduct or remarks by the

decision maker who terminated his employment.  There is no dispute that plaintiff is the member

of a protected class based on his national origin or that his termination constituted an adverse

employment action.  However, the parties do not agree about the sequence of events that led to his

termination on January 20, 2014.  According to defendant, plaintiff left work early and without

permission on January 17, 2014 and Owens attempted to discuss the matter with plaintiff the next

day.  Plaintiff walked out of Owen's office and allegedly threatened Wells, and defendant asserts

that Owens terminated plaintiff's employment for threatening a co-worker.  Plaintiff testified in his

deposition that he left work early on January 17, 2014 and he met with Owens the next day, but he

claims that Owens yelled at him and that Owens specifically stated that he was yelling at plaintiff

because he was Mexican.  Dkt. # 53-1, at 52.  Plaintiff denies that he threatened to harm Wells and

he claims that Wells and Owens are misrepresenting what happened on January 18, 2014.  Id. at 51-

52.  Plaintiff also claims that there was a prior incident in which Owens yelled him because he was

Mexican.  Id. at 46.  He claims that Owens told plaintiff that no one would believe plaintiff if he said

that Owens yelled at him, because Owens was the boss and plaintiff was Mexican.  Id. at 46-47.  The

Court must consider the evidence in a light most favorable to plaintiff, and there is a genuine dispute

based on plaintiff's testimony as to whether Owens harbored any bias against Hispanics.  The Court

14

finds that plaintiff can establish a prima facie case as to his Title VII and § 1981 claims based on his termination.

Defendant states that plaintiff was terminated for threatening a co-worker. Dkt. # 37, at 17. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007). Defendant has met its burden to come forward with a legitimate, non-discriminatory reason for terminating plaintiff's employment.

Plaintiff argues that defendant's legitimate, non-discriminatory reason for terminating his employment is pretext for unlawful discrimination. At this stage of the proceeding, the burden shifts to plaintiff to show that defendants' explanation for terminating plaintiff's employment is pretextual. Plotke v. White, 405 F.3d 1092,1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004). "A plaintiff demonstrates pretext by showing . . . that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)). A plaintiff typically attempts to satisfy his burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan v. Hilti, Inc.,

108 F.3d 1319, 1323 (10th Cir. 1997)).   A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).

Plaintiff claims that Wells and Owens repeatedly made discriminatory remarks and that there is a genuine dispute as to whether they acted with the intent to discriminate against plaintiff by terminating his employment.  Dkt. # 53, at 30.  In his deposition, plaintiff testified that Owens yelled at him on two occasions, including two days before his employment was terminated.  Dkt. # 53-1, at 46-51.  Defendant disputes plaintiff's version of what happened on January 18, 2014, and defendant argues that plaintiff has "shoddy credibility" and two isolated incidents would not be sufficient to establish pretext.  Dkt. # 57, at 5.  However, the Court cannot assess any witness' credibility when ruling on a motion for summary judgment based only on the opposing party's assertion that the witness is lying.  Fogarty v. Gallegos, 523 F.3d 1147, 1165-66 (10th Cir. 2008); Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000).  The Court also notes that Owens allegedly made a discriminatory remark to plaintiff two days before his employment was officially terminated, and this has a close temporal proximity the adverse employment action.  Plaintiff claims that Wells had a history of making discriminatory remarks to plaintiff and he made a false report to Owens that plaintiff threatened a co-worker.  Dkt. # 53, at 31-32.  Wells was not a decisionmaker in terms of the plaintiff's employment and much of the alleged discriminatory conduct occurred long before plaintiff was terminated, but there is sufficient evidence if viewed in a light most favorable to plaintiff to suggest that Wells' actions played a direct role in plaintiff's termination.  Specifically, Wells allegedly made a false report to Owens that plaintiff threatened a co-worker and plaintiff's deposition testimony could allow a reasonable jury to find that Owens already harbored

16

discriminatory animus against Hispanics. This calls into question whether Owens honestly believed that plaintiff threatened a co-worker on January 18, 2014 and this is sufficient to establish that the legitimate, non-discriminatory explanation for terminating plaintiff's employment is pretextual. Defendant's motion for summary judgment should be denied as to plaintiff's wrongful termination claim under Title VII and § 1981.

## B.

Defendant argues that plaintiff has not identified a specific promotion for which he was eligible and he cannot establish a prima facie case of discrimination under a failure to promote theory. Plaintiff responds that he was repeatedly passed over for promotion and there is a genuine dispute as to whether Caucasion employees were treated more favorably in terms of promotion. Dkt. # 53, at 44.

To establish a prima facie case of discrimination under a failure to promote theory, a plaintiff has the burden to show that "(1) [he] was a member of a protected class; (2) [he] applied for and was qualified for the position; (3) despite being qualified [he] was rejected; and (4) after [he] was rejected, the position was filled by someone outside the protected class." MacKenzie v. City and County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005). A plaintiff must identify specific positions for which he applied and was rejected, and it is not sufficient for a plaintiff to generally allege that he was denied promotions. Burks v. Mill Creek Lumber & Supply, 2012 WL 1536928, *7 (N.D. Okla. Apr. 30, 2012); PAS Communications, Inc. v. Sprint Corp., 139 F. Supp. 2d 1149, 1173 (D. Kan. 2001). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to state a legitimate non-discriminatory reason why plaintiff was not promoted. Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1307 (10th Cir. 2005). The burden shifts back to

plaintiff to show that there is a genuine dispute as to a material fact that defendant's stated explanation for failing to promote plaintiff is pretextual.  Id.

Plaintiff argues that Hispanics were generally passed over for promotion by defendant.  Dkt. # 53, at 44.  Plaintiff claims that he was "repeatedly" denied promotions, even though he was promised the he would "progress upwardly quickly" when he was hired.  Id.  He also cites Coronado's deposition testimony that people with less experience were being promoted ahead of Coronado and he didn't know if "it's discrimination of a race or maybe it was a misunderstanding." Dkt. # 53-2, at 18.  Plaintiff could be arguing that Wells was promoted to lead fabricator ahead of plaintiff and that Wells had a history of harassing plaintiff, and that this is evidence that he was denied a promotion to lead fabricator because of his race or national origin.  Dkt. # 53, at 44-45.

The undisputed evidence is that two employees were promoted to the position of lead fabricator during plaintiff's employment with defendant, and plaintiff has not argued that he was qualified for the position of lead fabricator in the motor control cabin division.  This leaves only the March 2012  promotion received by Wells to the position of lead fabricator in the piping division. This constitutes a specific position for which plaintiff could have been qualified and the Court will assume that plaintiff can establish a prima facie case of discrimination concerning this promotion. Defendant states that Wells was promoted ahead of plaintiff, because Wells had significantly more experience working as a welder and specifically that Wells had more experience with piping.  Dkt. # 37, at 13.  Plaintiff argues that the stated reason for promoting Wells is pretextual because Wells was unqualified for promotion due to his "obvious racial animus."  Dkt. # 53, at 11.  However, plaintiff does not dispute that Wells was more experienced and he has not shown that the person who made the decision to promote, Talladivedula, acted with any discriminatory intent by promoting

Wells. Plaintiff could also be arguing that Hispanic employees were generally discriminated against in terms of promotion, but the only evidence he cites in support of this claim is Coronado's deposition testimony. Coronado does not mention the specific promotion at issue, but he claims that he called the ethics hotline sometime between 2012 and 2014 to make an anonymous complaint about discrimination. Dkt. # 53-2, at 17-19. However, he also said that he did not know "it's discrimination of a race or maybe it was a misunderstanding." Id. at 18. The fact that an employer faced with competing applicants for a job opening promotes an employee that it honestly believes is better qualified is not evidence of pretext unless the plaintiff can show that there was an "overwhelming disparity in qualifications." Tran v. Sonic Indus. Servs., Inc., 490 F. App'x 115, 119 (July 19, 2012).[11] In this case, plaintiff does not dispute that Wells was more qualified based on his prior work experience, and plaintiff has not shown that defendant's reason for promoting Wells to the position of lead fabricator was pretextual. Defendant is entitled to summary judgment on plaintiff's failure to promote claim under Title VII and § 1981.

## C.

Plaintiff claims that he was subjected to a hostile work environment due to his race and national origin, and he argues that defendant is vicariously liable for Wells' actions due to his status as a supervisor. Dkt. # 53, at 39-40. Defendant argues that much of the conduct identified by plaintiff had nothing to do with his race or national origin, and the evidence does not show the alleged discrimination was sufficiently severe or pervasive to constitute a hostile work environment. Dkt. # 37, at 34-35.

---

[11] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

To establish that a hostile work environment existed, a plaintiff must prove four elements: "(1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [race or national origin]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Harsco Corp. v. Renner, 475 F.3d 1179 (10th Cir. 2007) (quoting Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1262-63 (10th Cir. 2005). The Tenth Circuit has established that the severe and pervasive nature of alleged harassment must be established under objective and subjective standards. Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1023 (10th Cir. 2001). Concerning the subjective aspect of a hostile work environment, the victim must show that he "subjectively perceive[d] th[at] environment to be abusive." Id. The objective component of a hostile work environment claim requires a plaintiff to present evidence that a "reasonable person" would find the same harassment so severe and pervasive that the workplace is objectively hostile or abusive. Morris v. City of Colorado Springs, 666 F.3d 654, 664 (10th Cir. 2012). A court must consider the totality of the circumstances and consider factors such as the frequency of the discriminatory conduct, the severity, whether the conduct is physically threatening or merely an offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. Id. The Tenth Circuit has described pervasiveness and severity as "independent and equal grounds" by which a plaintiff may meet this element of a hostile work environment claim, but the grounds "are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . ., while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." Tademy v. Union Pacific Corp., 614 F.3d 1132, 1144 (10th Cir. 2008). An employer can be held vicariously liable for an employee's unlawful

harassment if the employee was a supervisor, but otherwise an employer can be found liable if it was negligent in allowing a hostile work environment to exist. Vance v. Ball State University, 133 S. Ct. 2434, 2441 (10th Cir. 2013).

Much of plaintiff's argument in support of his Title VII and § 1981 claims under a hostile work environment theory is based on his view that defendant is vicariously liable for Wells' conduct in his capacity as plaintiff's supervisor. Dkt. # 53, at 40. However, defendant argues that Wells was not a supervisor for the purpose of a Title VII claim. In Vance, the Supreme Court held that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits.'" Vance. 133 S Ct. at 2443. An employee can also qualify as a supervisor if he works closely with a subordinate and can recommend and tangibly influence tangible employment actions. Kramer v. Wasatch County Sheriff's Office, 743 F.3d 726, 738 (10th Cir. 2014). Owens testified in his deposition that a lead fabricator is responsible for "coordinat[ing] the daily work, gather[ing] material, direct[ing] the employees on his team as what their job assignments for the day are. He will manage the time, do the paperwork, just any duties that are required in his area to manage the daily tasks." Dkt. # 37-11, at 2-3. Lead fabricators do not recommend the termination of employees and Owens does not consult with a lead fabricator before terminating an employee. Dkt. # 53-8, at 7. Plaintiff argues that Wells "issued written discipline" to plaintiff on at least eight occasions and that Wells was listed as the supervisor on the discipline forms. Dkt. # 53, at 41. However, this does not show that Wells had any influence over any tangible change to plaintiff's employment, because

21

the written discipline had nothing to do with plaintiff's termination.  Plaintiff was terminated for threatening a co-worker and Owens testified that he independently investigated the matter before terminating plaintiff's employment.  There is no evidence that Wells had any role in making significant changes to plaintiff's employment and he was not plaintiff's supervisor for the purpose of Title VII or § 1981.

Plaintiff argues that he was subjected to severe and pervasive mistreatment due to his race or national origin and that management was aware of Wells' conduct, and that there is genuine dispute as to a material fact that precludes summary judgment on his hostile work environment claim.  However, plaintiff's allegations are vague and unsupported by citation to any actual evidence in the summary judgment record.  Plaintiff does mention the duct tape incident, but Coronado's deposition testimony shows that the incident was originated by Coronado, not Wells, and that plaintiff could take the tape off.  Dkt. # 53-2, at 28.  Plaintiff took the tape off and directed Coronado to take his picture with tape over his mouth, and the evidence is clear that plaintiff voluntarily put the tape back over his mouth.  Dkt. # 37-21, at 3.  There is also no evidence suggesting that the incident was in any way related to plaintiff's race or national origin.  Plaintiff claims that Wells threw a piece of scrap metal at plaintiff and it hit plaintiff in the ankle.  Dkt. # 53-1, at 37-39.  Plaintiff admits that he was not injured and that the scrap metal was left in plaintiff's work area and, although plaintiff was subjectively offended, there is nothing suggesting that the incident was severe or based on discriminatory animus.  Plaintiff claims that Wells attempted to instigate a fight between plaintiff and co-worker and that management was indifferent.  Dkt. # 53, at 18.  Viewing the evidence in a light most favorable to plaintiff, Wells brought plaintiff and the co-worker, Bateman, together and said that it is "fun to see two people fight," but plaintiff walked away and the incident

22

ended.  Dkt. # 53-1, at 31-32.  There is no evidence that the harassment by the co-worker continued or that Wells encouraged any other incidents between plaintiff and Bateman.  Plaintiff brought the incident to Talladivedula's attention but there is no evidence that he framed the incident as a claim of discrimination.  Id. at 33.  In August 2010, plaintiff reported that a co-worker called him a "wetback."  Plaintiff's complaint was investigated and the co-worker, McClain, was denied a promotion due to the incident.  Dkt. # 37-5, at 103; Dkt. # 37-10, at 1.  The Court also cannot overlook evidence that plaintiff may have contributed to any racial hostility in the workplace, because a co-worker complained that plaintiff made a derogatory remark about white employees. Dkt. # 37-5, at 125.  Even if plaintiff subjectively believed that the workplace was hostile, he has not produced sufficient evidence that a reasonable person would have found that discrimination against Hispanics was so severe or pervasive as to constitute a hostile work environment, and defendant is entitled to summary judgment on plaintiff's hostile work environment claims under Title VII and § 1981.

## D.

Plaintiff claims that he was retaliated against for complaining of discrimination, and he seeks relief under § 1981.  Defendant argues that plaintiff cannot establish a prima facie case of retaliation under § 1981, because there is no evidence that plaintiff engaged in protected activity concerning racial or national origin discrimination.

To make a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the opposition and the adverse action.  Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004).  The law is clear that reporting workplace

discrimination to the EEOC is protected behavior.  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999); McCue v. State of Kansas, Dep't of Human Resources, 165 F.3d 784, 789 (10th Cir. 1999).  However, the filing of an EEOC charge is not the only type of protected activity and an informal complaint may constitute protected activity if it adequately puts an employer on notice of an employee's allegations of unlawful discrimination.  See Petersen v. Utah Dep't of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002).  An employee may establish causation by showing that the adverse employment action occurred soon after the protected activity.  Annett v. University of Kansas, 371 F.3d 1233, 1239-40 (10th Cir. 2004); Burrus v. United Tel. Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir. 1982).  "Unless there is a very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).  If the plaintiff can establish a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Pinkerton v. Colorado Dep't of Transp., 563 F.3d 1052, 1064 (10th Cir. 2009).  If the employer comes forward with a legitimate, non-discriminatory reason for its actions, the burden shifts to the employee to show that employer's stated reason is pretextual.  Id.

Plaintiff argues that he "repeatedly complained about his treatment to Wells, Talladivedula, Owens, and Human Resources" and he claims that he can show that he engaged in protected activity if he had a good faith belief that he engaged in protected activity.  Dkt. # 53, at 43.  However, he includes no citation to any evidence showing that he actually made a complaint that he had been discriminated against because of his race or national origin.  There is evidence that plaintiff made a complaint in August 2010 that a co-worker called him a wetback.  Dkt. # 37-10, at 1.  The

complaint was investigated and found to be credible, and the co-worker was denied a promotion for using discriminatory language. The evidence shows that plaintiff's complaint was taken seriously, and the complaint was so remote to plaintiff's termination in January 2014 that there could be no temporal connection between plaintiff's protected activity and his termination. Plaintiff testified in his deposition that he made an informal complaint to his lead man and Talladivedula that Wells had used discriminatory language. Dkt. # 53-1, at 44. Wells was not the lead fabricator at the time and Wells did not make any similar comments after plaintiff reported the incident. Id. at 45. The incident must have occurred before March 26, 2012, because that is the date Wells was promoted to the position of lead fabricator. The Court will treat the informal complaint as protected activity, but the incident is also too remote from plaintiff's termination to support a prima facie case of retaliation. Plaintiff has provided no evidence that he engaged in any protected activity at any time near his termination in January 2014, and he cannot establish a prima facie case of retaliation. Summary judgment will be entered in favor of defendant on plaintiff's retaliation claims under Title VII and § 1981.

## E.

Defendant argues that it cannot be held liable for negligent hiring or supervision when a plaintiff alleges that he was harassed by a co-worker, because there is no evidence that defendant was aware of the alleged harassment or that defendant failed to properly supervise any employee. Dkt. # 37, at 47-48. Plaintiff responds that defendant had a duty to exercise ordinary care to prevent harassment in the workplace, and he claims that "supervisory personnel" knew about the harassment to which plaintiff was subjected. Dkt. # 53, at 41-42.

Under Oklahoma law, a plaintiff asserting a negligence claim must show "(1) a duty owed by the defendant to protect plaintiff from injury (2) failure to fulfill that duty and (3) injuries to plaintiff proximately caused by defendant's failure to meet the duty." Fargo v. Hays-Kuehn, 352 P.3d 1223 (Okla. 2015). In the employment context, an employer may be liable to a third party for negligent supervision based on the conduct of an employee if the employer "had reason to believe that the person would create an undue risk of harm to others." N.H. v. Presbyterian Church (USA), 998 P.2d 592, 601 (Okla. 1999). It is unclear whether the Oklahoma Supreme Court would extend the tort of negligent supervision to an employee alleging harassment by a co-worker, but the Court will assume that such a claim would be permitted under Oklahoma law. See Bowdish v. Federal Express Corp., 699 F. Supp. 2d 1306, 1327 (W.D. Okla. 2010) (expressing doubt that an employee could allege a claim of negligent supervision against his employer).

The Court will assume for the sake of argument that a plaintiff could allege a negligence claim against his employer for workplace harassment. In plaintiff's amended complaint, he alleges claims of negligent supervision or hiring because defendant failed to protect its employees from unlawful harassment. Dkt. # 17, at 7-8. However, he has offered no evidence or argument in support of a negligent hiring claim and the Court will consider only whether plaintiff has established a genuine dispute as to a material fact under a theory of negligent supervision. Plaintiff's response to defendant's motion for summary judgment is somewhat vague as to his theory under which defendant could be held liable for negligence, but he appears to be arguing that "supervisory personnel" were aware of incidents involving racially derogatory language and the duct tape incident. Dkt. # 53, at 46. However, he fails to specify who these "supervisory personnel" might have been and he fails to present an evidence of what acts of harassment of which defendant had

knowledge.  There is evidence that plaintiff complained that  a co-worker, McClain, made a derogatory remark, but the incident was promptly dealt with and plaintiff was not retaliated against for making the complaint.  Plaintiff could be arguing that Wells participated in or was aware of certain acts of alleged harassment, but Wells was not a supervisor and the evidence shows that plaintiff made only one complaint about Wells' conduct.  Dkt. # 53-1, at 44-45.  This is not sufficient to show that defendant was aware of repeated and ongoing harassment in the workplace or that defendant failed in its duty to protect employees from unlawful harassment.  Plaintiff has made no attempt to specify what evidence supports his negligence claim against defendant and, assuming that such a claim is legally cognizable, the Court finds that defendant should be granted summary judgment on plaintiff's negligence claim.

## F.

Defendant argues that plaintiff cannot prevail on a claim of intentional infliction of emotional distress, because there is no evidence that defendant engaged in extreme and outrageous conduct or that plaintiff suffered severe emotional distress.  Dkt. # 37, at 44-47.  Plaintiff argues that there is a genuine dispute as to whether defendant's conduct was extreme and outrageous, but he makes no argument that he suffered severe emotional distress as a result of defendant's conduct.  Dkt. # 53, at 46-47.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'   The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Publications, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  Id. The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff.  See Computer Publications, 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged

failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Plaintiff argues that he was "persistently bullied and harassed by Wells" and was repeatedly called racial slurs, and he claims that there is a genuine dispute as to whether defendant's conduct was extreme and outrageous. Dkt. # 53, at 47. Plaintiff's argument in support of his intentional infliction of emotional distress claim is minimal and vague, and he does not clearly set forth what events he is relying upon to show that defendant engaged in extreme and outrageous conduct. Plaintiff relies on the duct tape evidence as the principal evidence in support of his argument defendant engaged in extreme and outrageous conduct. The evidence is undisputed that plaintiff took the tape off and that he put the tape on again to allow Coronado to take a picture of him. While plaintiff may not have thought the incident was a joke, it does tend to show that plaintiff could remove the tape and that the incident was not so severe as to independently warrant a finding that defendant's conduct was extreme and outrageous. There is also no evidence that plaintiff reported the conduct to his supervisor, even though he had a history of making complaints when alleged discriminatory conduct occurred. Dkt. # 37-5, at 103. The Court notes that on at least one incident

a Caucasion worker reported that plaintiff made a racial slur, and this shows that plaintiff contributed to any hostility in the workplace.  Dkt. # 37-5, at 125.  The Court does not find that defendant's conduct was extreme and outrageous and he has made no argument that he suffered severe emotional distress, and the Court finds that defendant is entitled to summary judgment on plaintiff's intentional infliction of emotional distress claim.

IT IS THEREFORE ORDERED that Defendant Helmerich & Payne International Drilling Co.'s Motion for Summary Judgment against Plaintiff, [Victor Velazquez] and Brief in Support (Dkt. # 37) is **granted in part** and **denied in part**: the motion is denied as to plaintiff's wrongful termination claim under Title VII and § 1981, but defendant's motion for summary judgment is granted as to all other claims.  The only claims remaining for adjudication are plaintiffs' wrongful termination claims under Title VII and § 1981.

IT IS FURTHER ORDERED that Defendant's Motion for Leave to Join Parties and Amend Answer to Assert Counterclaims (Dkt. # 26) is **denied**.

IT IS FURTHER ORDERED that this case is referred to Magistrate Judge Paul J. Cleary for a supplemental settlement conference.

DATED this 29th day of January, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE